**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION, CINCINNATI**

ROOTED, LLC,

               *Plaintiff,*

               *v.*

DISCOVERY, INC., et al.,

               *Defendants.*

Civil Action No: 1:21-cv-00328-MRB

Judge Michael R. Barrett

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR PRELIMINARY INJUNCTION**

## I. INTRODUCTION

In 2014, a Cincinnati woman, Megan Tysoe, started a small business called ROOTED, producing and selling healthy and delicious plant-based food and beverage items. She created a logo and other marks, and trademarked ROOTED. She has four stores in the Cincinnati area, with a fifth opening in Kentucky; she also sells products online through social media channels.

In 2020, Discovery asked an entrepreneur to participate in a "reality" show it created, called Undercover Billionaire. The program follows this entrepreneur as she tries to create a million-dollar business in 90 days. The entrepreneur, Defendant Mosley, starts a business called ROOTED to market and sell healthy plant-based foods and beverages throughout the country online, in-person, and through social media. Essentially, Mosley has re-created Plaintiff's business, with the same marks and products but with Discovery's national advertising campaign behind her.

Discovery's Undercover Billionaire television show serves as an episodic infomercial for Defendants Mosley and MLE's[1] "Rooted" business and is infringing on Plaintiff's federal

---

[1] Mosley formed Defendant Monique Lenai Enterprises, LLC ("MLE") in the State of Washington on or about August 3, 2020, describing it as a "juice business." Dkt. 1 ¶ 28.

trademarks. The show is an unquestionable endorsement of and megaphone for Mosley/MLE's infringing brand. Discovery continues to make Undercover Billionaire episodes that include Mosley/MLE available for streaming and purchase across a number of websites and streaming platforms to millions of consumers, anywhere and at any time. As a direct result of Discovery's continued advertisement, endorsement, and distribution of Undercover Billionaire, Plaintiff is suffering mounting irreparable harm, including ever-increasing reverse confusion, the usurping of her business plans to expand into e-commerce, loss of goodwill, and loss of reputation.

Plaintiff informed Defendants of the infringement shortly after learning of it and Mosley has since withdrawn her application to federally register ROOTED. But Defendants have continued their infringement, unabated. So Plaintiff must seek a preliminary injunction to bring this infringement immediately to a halt.

The marks are identical and cover the same goods/services and it is unsurprising that actual consumers have expressed confusion over source. On these grounds, Plaintiff clearly exceeds the "likely to succeed on the merits" test for her claims of trademark infringement. Barring an immediate injunction, Plaintiff will continue to suffer irreparable harm. Discovery's show is an infringing "product," and the Discovery platform, with all of its advertising, promotion and reach, has escalated what would otherwise have been a geographically isolated infringement into a nationwide assault on Plaintiff's well-established intellectual property rights. This is precisely the situation that injunctive relief is intended to remedy, especially where any possible harm from an injunction to Defendants is of their own creation.

## II.    STATEMENT OF FACTS

### A.  Plaintiff's Goodwill in the Rooted Brand.

Plaintiff Rooted, LLC ("Plaintiff") is a woman-owned and operated company with a

2

mission to provide people with healthy and delicious plant based foods and beverages, including but not limited to, juices, single juice shots, and smoothies branded under her ROOTED family of marks. Decl. of Megan Elisabeth Tysoe ("Tysoe Decl.") ¶ 1. She opted to use the suggestive mark ROOTED based on its implications of: 1) the plant-based nature of Plaintiff's products; and 2) the grounding of the brand in the earth and the community. *Id.* ¶ 1. In her efforts to deliver locally and organically sourced natural food products to customers, the ROOTED brand is an active participant in sustainability efforts through partnerships with local farms. *Id.* ¶ 6.

As of June 2021, Plaintiff owns and operates four physical locations in southern Ohio and advertises and delivers to customers through third party delivery services in Ohio and Kentucky. *Id.* ¶ 3. Plaintiff also ships select products directly to consumers, upon request. *Id.* Plaintiff has also partnered with regional and national organizations, at which she also prominently displays and sells her ROOTED-branded juices to customers from leased refrigerators. *Id.* ¶ 4.

Plaintiff has continuously used, advertised, and promoted its ROOTED Marks for the last six years and in doing so has created a significant amount of brand goodwill. *Id.* ¶¶ 1, 5. She has invested significant resources, including advertising campaigns, promotional efforts, and on social media to develop and foster her reputation, recognition, and goodwill associated with her products and services provided under the ROOTED Marks (*defined infra*). *Id.* ¶ 5. The information provided at https://www.rootedjuicery.com/ is just one example of her efforts. *Id.* ¶ 4. Plaintiff has also advertised in both print and digital media, including Edible Ohio Valley, which creates nearly 47,000 impressions. *Id.* Plaintiff also enjoys regular unsolicited press coverage, applauding her high-quality, plant-based foods and expansion efforts. *Id.* ¶ 5.

### B. Plaintiff's ROOTED Marks.

Plaintiff is the owner of the ROOTED Marks, and variants thereof and has registered such

marks in the United States Patent and Trademark Office ("USPTO"), including U.S. Registration Nos. 5,016,529, 5,532,620, 5,543,335, 5,016,480, 5,851,802, 5,851,803, 5,016,493, 5,253,647, 5,538,053, 5,543,336, 5,016,530, and 5,851,876 as well as U.S. Application No. 90/654,007. Tysoe Decl. ¶¶ 16-28. Each of the aforementioned registrations is currently valid, subsisting and in full force and effect, and is registered on the USPTO's Principal Register. *Id.* ¶ 29. True and accurate copies of the registration certificates are attached to the Complaint. *See* Dkt. 1-1.

### C. Defendants' Infringing Activity.

#### i. Discovery Channel's Undercover Billionaire Reality Television Show.

Discovery airs a popular reality television show called Undercover Billionaire, reportedly reaching approximately one million viewers per episode. Tysoe Decl. ¶ 7; Declaration of Elizabeth A. Werner ("Werner Decl.") ¶¶ 2-3. First airing on Discovery in 2019, Discovery's first season originally challenged a billionaire to create a million-dollar business in 90 days. Tysoe Decl. ¶ 7. Based on the success of the first season, Discovery released its second season on January 6, 2021 and features the successes and failures of three new entrepreneurs, who go undercover in three different cities and attempt to start a business with a valuation of $1 million in 90 days – the same challenge as in Season 1. *Id.* Due to its premise, the show is nothing more than a multi-part commercial for the three businesses featured in the show, their developing brands, and their products, as well as the entrepreneurs themselves.

To reach the most viewers possible, Discovery is airing the second season simultaneously on Discovery Channel and Discovery+, Discovery's on-demand streaming channel. Tysoe Decl. ¶ 8. Discovery also makes the show available on-demand via Hulu and Discovery's website and for purchase on the Apple Store, Google Play, Amazon.com, YouTube and Vudu. Werner Decl. ¶¶ 4-9. Discovery receives revenue from streamers who purchase the season, paid subscriptions to a

Discovery platform, and ad revenue.

Discovery has dedicated considerable resources in promoting the show. In addition to airing, broadcasting, and making it available, Discovery maintains a website endorsing the featured entrepreneurs in order to promote the show, including Mosley and MLE. Werner Decl. ¶¶ 10-11. Discovery also promotes the show on social media, including through its Instagram accounts @undercoverbillionaire, with approximately 1,100 followers and @discovery, with approximately 14.1 million followers. *Id.* ¶ 12; Tysoe Decl. ¶ 7.

### ii. Mosley/MLE and the "Rooted" Brand.

Discovery selected Defendant Monique Idlett-Mosley ("Mosley") as one of the "undercover billionaires" featured in Season Two. Previously, Mosley worked as an advertising executive with own advertising agency, evidencing her knowledge and experience with product branding. Werner Decl. ¶ 13. Mosley, who appears as "Monique Lenai," has started a business that she calls "Rooted" – identical to Plaintiff's business –to deliver healthy juices and food to communities lacking access to those products – also identical to Plaintiff's products. Werner Decl. ¶ 14; *see also, e.g.*, *Undercover Billionaire ("UB"): Fist or Finesse* (Discovery+ broadcast Feb. 3, 2021); *UB: The Closers* (Discovery+ broadcast Feb. 10, 2021); *UB: Turning Points* (Discovery+ broadcast Feb. 24, 2021); *UB: Dumpster Fire* (Discovery+ broadcast Mar. 3, 2021).

Mosley revealed her plan to scale her "Rooted" business through franchising and e-commerce to investors. Dkt. 1 ¶ 24; Werner Decl. ¶¶ 13-14. She initially sold her juice "shots" through a single truck located in Tacoma, Washington but has since launched rootedlifestyle.co, where consumers may purchase these juice shots and other healthy food options online, from any state or country at any time. Werner Decl. ¶ 14. These shots may be purchased individually or as part of a subscription package. Werner Decl. ¶ 14.

Mosley's food truck, her Rootedlifestyle.co e-commerce site, the products sold on that site, and her linked Instagram page (@rootedlifestyle) each prominently displays Mosley's infringing "Rooted" mark. Werner Decl. ¶¶ 14, 15. Mosley has further used the hashtag #rootedjuicery on Instagram to hyperlink social media users to her posts about her "Rooted" brand[2] – this same hashtag was originally generated by and is used by Plaintiff. Werner Decl. ¶ 16; Tysoe Decl. ¶ 4.

MLE applied for a federal trademark (Ser. No. 90/536,749) for its use of "Rooted," purportedly in connection with "Mobile street vendor services featuring food and drink; Promoting public awareness of the need for increased access to fresh, healthy, and organic nutrition in low-income communities; Promoting public awareness of the impact of socioeconomic inequality on low-income communities' access to fresh, healthy, and organic nutrition." Dkt. 1 ¶ 29. MLE abandoned the application on May 14, 2021, after the Complaint was filed. Werner Decl. ¶ 17.

### iii. Plaintiff Learns of Defendants' Infringement.

On or about March 22, 2021, the operator of the YouTube show "Trademark Screw Ups" notified Plaintiff of Defendants' use of ROOTED on Undercover Billionaire. Tysoe Decl. ¶ 7. Prior to this communication, Plaintiff was unaware of Mosley/MLE's infringing "Rooted" brand. Taking the policing of her intellectual property rights seriously, Plaintiff immediately took steps to cease the infringement. On April 12, 2021, Plaintiff's counsel issued a letter to Discovery and MLE, requesting that Defendants discontinue use of the ROOTED Marks. Dkt. 1 ¶ 35. Despite this notification and a subsequent call with counsel for Mosley/MLE, Defendants have not complied with Plaintiff's requests. Discovery continues to air Undercover Billionaire, featuring Mosley's and MLE's continued use of the ROOTED Marks. Dkt. 1 ¶¶ 35-39.

---

[2] It should be noted that as of the time of filing this Motion, Mosley has scrubbed her social media accounts of all such references.

### D. Defendants' Continued and Intentional Infringement.

Discovery continues to air and distribute the second season of Undercover Billionaire across a multitude of platforms and endorse Mosley's ROOTED business. Werner Decl. ¶¶ 4-9. In fact, Discovery has changed nothing with respect to how it does business or to acknowledge its trampling of Plaintiff's rights; instead, Discovery has only acted to increase the exposure of the infringing ROOTED business. Discovery even operates an Instagram account for visitor interaction with Undercover Billionaire. *Id.* ¶ 12. Discovery also appears to permit Mosley to use images from the show on her webpages that display the ROOTED Marks. Werner Decl. ¶ 14.

Mosley and MLE continue to infringe ROOTED and use it to market and sell products (namely juice shots) through her website ***rooted***lifestyle.co website, her verified Instagram account (@moniqueIdlett), Dkt. 1 ¶ 40, and her verified Twitter account (@Monique_Mosley_), Werner Decl. ¶ 18, notwithstanding MLE's express abandonment of its federal trademark application for "Rooted" on May 14, 2021, a single day after the Complaint was filed. Mosley's and MLE's doing so, along with scrubbing of Mosley's social media accounts following filing of the Complaint, are implicit admissions of liability. Werner Decl. ¶¶ 16-17. Yet, since the launch of her brand, Mosley has enjoyed free endorsement and promotion from Discovery through the airing and distribution of Undercover Billionaire and the show's featured success of her "Rooted" business, support from local celebrities, and media coverage regarding building the brand. *Undercover Billionaire Season Two ("UBS2")* (Discovery+ broadcast); Werner Decl. ¶¶ 13, 19-25; Tysoe Decl. ¶ 11.

### E. Defendants Are Causing Consumers to Confuse Mosley/MLE as the Original Source of ROOTED Branded Plant-Based Juices and Other Products.

Given that Plaintiff's ROOTED Marks and the mark at issue are identical in sight and sound, unsurprisingly, consumers are actually confused as to whether Plaintiff and Defendants are affiliated or the same. For example, Plaintiff has already experienced the following instances of

7

actual confusion based on Discovery's amplification of Mosley/MLE's infringing use of the

ROOTED Marks:

- Google's search engine auto populating results for "rooted juicery" to include at least three results related to Mosley, Werner Decl. ¶ 26;

- A January 15, 2021 unsolicited email from a third party in South Florida who "would love the opportunity to speak with Monique," after seeing her on Undercover Billionaire, Tysoe Decl. ¶ 9;

- A January 16, 2021 unsolicited email with the subject line "Monique please help" from a third party in Miami, Florida, who claims to have seen Plaintiff on Undercover Billionaire and requests juicing information, *id.*;

- An April 27, 2021 unsolicited email from a third party in Botswana, Africa seeking franchise opportunities after seeing Mosley on Undercover Billionaire, *id.*;

- An unsolicited email from a third party who claims to have seen "this product developed on Undercover Billionaire" and that she should like to "buy this product right off the shelf!" She further notes that "[t]his is the type of company I would love too [sic] support!", *id.*;

- An application for employment from an individual living in Turkey, who had watched Undercover Billionaire and wanted to work for "Rooted," *id.*;

- A comment on Plaintiff's Instagram page dated approximately 11 weeks ago, which asks "Is this a chain from @moniqueidlett rooted from under cover [sic] billionaire?", *id.* ¶ 10;

- A comment on Plaintiff's Instagram page dated approximately 10 weeks ago, which asks "Is this the company and product I saw on Undercover Billionaire?", *id.*;

- A comment on Plaintiff's Instagram page dated approximately 9 weeks ago, which states "love you guys from undercover billionaire <3," *id.*;

- A Reddit thread titled "What happened to 'Rooted company?'" and dated approximately one month ago, in which a person responded that Mosley's Rooted business is "actually doing quite well now apparently, with 4 storefronts in Ohio. They've ditched the ice cream truck idea by the looks of it and are now just Clean Juice 2.", Werner Decl. ¶ 27.

**F. The Effect of Defendants' Infringements on Plaintiff's Business.**

Without question, Defendants' unlawful use of the ROOTED Marks has damaged

Plaintiff's business. For one, Plaintiff has been forced to put her expansion plans on hold until this matter is resolved. Tysoe Decl. ¶¶ 12-13. After investing thousands of dollars into an e-commerce platform, Plaintiff halted the launch of her online store due to the actual confusion occurring in the marketplace and delayed the launch of her nationwide shipping program. *Id.* Plaintiff has little incentive to dedicate resources to promote a brand that is being effectively stolen by a multi-national media conglomerate and the celebrity entrepreneur it is featuring.

Discovery's sustained advertising, promotion, and distribution of Undercover Billionaire creates an insurmountable obstacle to Plaintiff, causing consumers to believe that Mosley is the owner of ROOTED, while making Plaintiff appear in commerce as essentially either a non-player or the junior user. The media power of Discovery, coupled with the personality of Mosley, is not something easily overcome by a small, Midwestern company, who otherwise did everything right in protecting her intellectual property. As Mosley/MLE's revenue grows, so too does that of Discovery and so, too, grows the damage to Plaintiff's goodwill.

## III.    LAW AND ARGUMENT

The four factors for granting preliminary injunctive relief under the Sixth Circuit are well established:

> 1) whether the plaintiff has a strong likelihood of success on the merits;
> 2) whether the plaintiff will suffer irreparable injury without the injunctive relief;
> 3) whether the injunction would cause substantial harm to others; and
> 4) whether the injunction negatively impacts the public interest.

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 466, 574 (6th Cir. 2002). These factors are not prerequisites but instead are elements balanced by this Court. *State Farm Mutual Auto. Ins. Co. v. Sharon Woods Collision Ctr., Inc.*, 1:07cv457, 2007 WL 4207158 at *10 (S.D. Ohio Nov. 26, 2007). No one factor is dispositive, and a plaintiff need not prove that all the factors weigh in its favor. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

**1.** *Plaintiff will likely succeed on the merits.*

"The touchstone of liability [for trademark infringement] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997). The Sixth Circuit considers the following eight non-exclusive factors in determining the likelihood of confusion: (1) similarity of the mark; (2) strength of the mark; (3) relatedness of the goods; (4) evidence of actual confusion; (5) marketing channels used; (6) the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." *AWGI, LLC v. Atlas Trucking Co., LLC*, 998 F.3d 258, 264-65 (6th Cir. 2021).

          a.    <u>Plaintiff will likely succeed on the merits of her likelihood of confusion claim.</u>

Plaintiff, the senior user and registrant of the ROOTED Marks, is likely to prevail over Defendants on these elements. The strong evidence of mark similarities, overlapping use and actual confusion are more than sufficient to satisfy the Sixth Circuit's test for finding infringement. *White of Dublin, LLC v. After the Ring LLC*, No. 2:13-CV-120, 2013 WL 1399337, at *1, *5 (S.D. Ohio Apr. 5, 2013) (granting permanent injunction given that, *inter alia*, the parties are in direct competition and use similar means of advertising, which would likely cause confusion and injure Plaintiff's reputation). Moreover, there is no cognizable defense here by Defendants. It is difficult to think of a clearer case of trademark infringement and the facts presented here detail a textbook example of how to intentionally infringe on another's established set of marks.

          i.    **The parties' marks are identical.**

Plaintiff's main registration for ROOTED is a standard character mark, such that any stylistic differences are inconsequential. *See Citigroup Inc. v. Capital City Bank Grp., Inc.* 637

F.3d 1344, 1353 (Fed. Cir. 2011) ("If the registrant . . . obtains a standard character mark without claim to 'any particular font style, size or color,' the registrant is entitled to depictions of the standard character mark regardless of font style, size, or color, not merely 'reasonable manners' of depicting its standard character mark."); J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 19:58 (5th ed.) ("A standard character registration provides a registrant with the broadest form of coverage for the registered mark because such a registration gives the registrant rights in the mark in block letters as well as in 'depictions of the standard character mark regardless of font style, size or color.'") (citation omitted). Defendants' use of a stylized version of ROOTED is irrelevant. Discovery, Mosley and MLE display, spell, pronounce, and use ROOTED in the same fashion as Plaintiff. Indeed, in every episode of Undercover Billionaire that Discovery airs, Mosley's social media, and her promotional efforts, Mosley refers to "Rooted" alone without any additional wording or designation. *UBS2* (Discovery+ broadcast); Werner Decl. ¶¶ 14, 25. As a result, this factor weighs in favor of finding that confusion is likely.

### ii.      Plaintiff's ROOTED Marks are very strong.

Plaintiff's multiple registrations for her family of ROOTED Marks evidence her established valid and protectable rights in them. The USPTO, in issuing these registrations, acknowledges the strength of these marks and their capabilities for serving as unique marks for the goods and services described in the registrations.

There is a high degree of distinctiveness in the ROOTED Marks. The protectability of a mark depends on the level of the mark's distinctiveness. *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 761 (6th Cir. 2005). Courts recognize five classifications of a mark's distinctiveness: generic, descriptive, suggestive, arbitrary, or fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Suggestive marks "are inherently distinctive and are protectable so long as the putative

owner has actually used the mark." *Tumblebus*, 399 F.3d at 761 (citing *Two Pesos*, 505 U.S. at 768)). Plaintiff's ROOTED Marks are suggestive and therefore are inherently distinctive and protectable. This second factor also weighs in favor of finding that confusion is likely.

iii.    **The goods are identical, such that any new products will likely overlap, and are offered in the same marketing channels.**

It is indisputable from Undercover Billionaire and MLE's website that "Rooted" is used in connection with health foods, particularly juice. *UBS2* (Discovery+ broadcast); Werner Decl. ¶ 14. The Sixth Circuit has identified three categories regarding the relatedness of goods. Of particular relevance, if the parties compete directly in the sale of the same goods, confusion is likely if the marks are sufficiently similar. *Daddy's Junky Music Stores*, 109 F.3d at 282. Here, Plaintiff and Mosley/MLE are directly competing with identical marks, such that confusion is likely.

Plaintiff and Mosley/MLE both sell juice, which greatly increase the likelihood that a purchaser would believe that Mosley/MLE are the same as or connected with Plaintiff. *See id.* at 282-83 (affirming the district court's finding that the fact that both parties sold retail musical instruments increased the likelihood of confusion, even though one party sold used instruments and the other did not). Moreover, given the identical nature of the goods, it stands to reason that any expansion efforts Mosley/MLE take beyond their current products would overlap with those Plaintiff already offers (e.g., smoothies, granola, etc.).

Similarly, the parties offer (or intend to offer) their products in similar trade channels. *See id.* at 285 (finding similarities in marketing channels represent strong evidence of a likelihood of confusion). Both Plaintiff and Mosley/MLE mainly sell directly to consumers. Tysoe Decl. ¶ 3; Werner Decl. ¶ 14. Plaintiff's customers can purchase products directly from her website, via Direct Messaging on Instagram, and from her brick-and-mortar locations. Tysoe Decl. ¶ 3. Plaintiff

12

also was on the verge of launching an e-commerce site to sell pre-packaged food products but suspended the launch in light of learning of Defendants' infringing conduct. *Id.* ¶¶ 12-13. Similarly, Mosley/MLE operate an e-commerce site, where MLE directly sells to consumers and also sells to consumers face to face via a mobile truck. Werner Decl. ¶ 14. Beyond end consumers, the parties also sell or intend to sell their products directly to local community partners. Namely, Plaintiff has already partnered with Alliance Integrative Medicine, Modo Yoga, and Pure Barre to sell her products. Tysoe Decl. ¶ 4. Similarly, MLE is admittedly seeking local partner opportunities and franchisees for its products. Werner Decl. ¶ 14.

Although Discovery's reach is likely broader than Plaintiff's, certainly some of Discovery's viewers overlap with Plaintiff's target market, as evidenced by the consumer confusion in the record and discussed above. Admittedly, Plaintiff does not advertise her company on an internationally distributed television show. However, the trade channels identified *on the show* are the same as those of Plaintiff, which is the operative fact. Like Plaintiff, Discovery advertises and features Mosley/MLE's Rooted products on its own social media and the internet.

In short, the identical nature of the parties' goods and the parties' marketing in the same trade channels weigh in favor of finding that confusion is likely.

### iv. Consumers are actually confused.

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Daddy's Junky Music Stores*, 109 F.3d at 283. This factor "is weighted heavily" where there is evidence of actual confusion. *State Farm,* 2007 WL 4207158 at *4 (citation omitted). Here, despite the early stages of this litigation, there have already been numerous instances of actual confusion, including those listed, *supra* § II.E. Unquestionably, this confusion arises from the widespread publication of Mosley/MLE's Rooted business through Discovery's multimedia and social media

platforms. This factor greatly weighs in favor of finding that confusion is likely.

> **v. The degree of care exercised by consumers is the same.**

"Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1111 (6th Cir. 1991). In addition, if the marks are similar, "then purchaser care will decrease the likelihood of confusion only minimally." *Daddy's Junky Music Stores*, 109 F.3d at 286.

Plaintiff's mission is to offer health food to all consumers such that she does not target a particular demographic of customers. Tysoe Decl. ¶ 1. Likewise, Mosley has expressed that her desire is to offer her products to all people. Werner Decl. ¶ 14. Additionally, Plaintiff's and Mosley/MRE's products are relatively inexpensive items, such that purchasers do not spend significant time making purchasing decisions. *T. Marzetti Co. v. Roskam Baking Co.*, No. 2:09-CV-584, 2010 WL 2162903 (S.D. Ohio May 27, 2010) (holding degree of purchaser care weighed in favor of finding likelihood of confusion based on product cost and minimal decision making).

Discovery's consumers are likely even less sophisticated when deciding to watch the show and drawing conclusions about Mosley/MLE's Rooted business. Discovery markets to all potential viewers and makes its programming accessible to anyone who is willing to pay for it, whether separately or within a television channel bundle. Discovery consumers who may only watch five minutes of one episode of Undercover Billionaire and then subsequently happen upon Plaintiff are likely to immediately assume Plaintiff and Mosley/MLE are one and the same. This factor also weighs in favor of a finding of likelihood of confusion.

> **vi. Defendants have acted in bad faith and with intent.**

An inference of bad intent arises whenever a defendant chooses a mark that is substantially

similar to that of a senior user, offering identical goods or services, through the same marketing channels. "Circumstantial evidence of copying, particularly 'the use of a contested mark with knowledge of the protected mark at issue,' is sufficient to support an inference of intentional infringement where direct evidence is not available." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 638-39 (6th Cir. 2002). The Sixth Circuit has further held that "extensive advertising and long-term use of a protected mark can create a presumption that the alleged infringer knew of the protected mark." *Daddy's Junky Music Stores*, 103 F.3d at 286.

Defendants continue to capitalize on Plaintiff's brand in bad faith. On April 12, 2021, Plaintiff notified Defendants of their ongoing infringement. Dkt. 1 ¶ 35. Yet, despite multiple exchanges to resolve the issue, Defendants never stopped using or displaying the ROOTED Marks. *Id.* ¶¶ 36-39; *UBS2* (Discovery+ broadcast); Werner Decl. ¶ 14. While MLE abandoned its "ROOTED" trademark application and Mosley scrubbed her social media of all references to ROOTED to conceal infringing uses, those infringing uses have not ceased. Despite Mosley's experience with branding as an advertising executive and Defendants' knowledge of their infringements through their receipt of a cease and desist letter, Defendants persist in damaging the goodwill of Plaintiff's brand.

If anything, Defendants have doubled-down on their infringements. Mosley continues to feature and promote her "Rooted" business, and Mosley continues to use ROOTED on internet advertising, social media, and the media, as recently as a June 11, 2021 interview. Werner Decl. ¶ 25. Mosley continues to sell her infringing ROOTED products on www.rootedlifestyle.co. *Id.* ¶ 14. Likewise, Discovery, despite notice of infringement, has done nothing to cease in the infringing activities and continues to promote and make season two of Undercover Billionaire available for public consumption to anyone at any time. *Id.* ¶¶ 4-9. This factor also weighs in favor of finding

15

that confusion is likely.

          b.    <u>Discovery is not only responsible for direct infringement but also contributory infringement.</u>

Discovery's Undercover Billionaire is, standing alone, a direct and persistent infringement for all the reasons stated above. But the Sixth Circuit has affirmed, "liability under the Lanham Act may be imposed on those who facilitate trademark infringement." *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 503 (6th Cir. 2013). Namely, if a "distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, [it] is contributorily responsible for any harm done as a result of the deceit." *Id.* (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982)). Discovery has done just this.

The Sixth Circuit addressed contributory infringement against a flea market operator in *Coach*. The court upheld an award of damages against the operator who "continued to rent spaces at his flea market to vendors that he knew, or should have known, were engaging in infringing activity." *Coach*, 717 F.3d at 504. There, the defendant continued to rent space to vendors that he knew or should have known were selling infringing products after the defendant received a cease and desist letter from plaintiff, received a warning letter from the district attorney warning him that he was willfully violating state and federal trademark law, law enforcement raided the flea market, and the plaintiff filed the trademark case against him. *Id.* at 503-04.

Like in *Coach*, Plaintiff alerted Discovery of its infringement, which turned a blind eye to her allegations and continued to allow Mosley/MLE to infringe Plaintiff's trademarks. Without Discovery's Undercover Billionaire, Mosley would not have even created her "Rooted" business nor would have had the breadth of free promotion and advertising she now receives from Discovery. Discovery's Undercover Billionaire is both infringing Plaintiff's ROOTED mark and

16

the very genesis of and platform for Mosley/MLE's infringements. Discovery cannot deny its knowledge of Mosley/MLE's infringing activity based on Plaintiff's cease and desist letter and its response, yet continues to sell, distribute and make available Undercover Billionaire to customers anytime and anywhere, all while making a profit from sales and ad revenue related to the show.

The fact that Discovery is a media company and its show is widely distributed is of no consequence. Without Discovery's creation of Undercover Billionaire, Mosley would not have created her infringing Rooted business, and this lawsuit would never have existed. Consider if Mosley and MLE had devised a business model for a new electric vehicle and named it "Tesla" or a computer called "Apple." Discovery would have taken action to prevent them from doing so. The only difference here is, unlike these more well-funded companies, Plaintiff is a small, Midwestern business apparently of no concern to Discovery. Trademark law does not discriminate against young entrepreneurs in favor of Hollywood–Discovery's platform for Mosley's business is no less offensive of Plaintiff's rights than had Mosley used "Tesla" or "Apple." Given Discovery's endorsement of Mosley/MLE's direct infringement, Plaintiff is likely to succeed in a claim of contributory infringement against Discovery.

### 2. *Plaintiff is suffering irreparable injury that will continue to accrue without injunctive relief.*

Plaintiff has and continues to incur damages based on Defendants' conduct. "In the context of trademark litigation, 'grounds for irreparable harm include loss of control of reputation, loss of trade, and loss of goodwill,' regardless of whether the infringer is putting the mark to a good or favorable use." *Audi AG & Volkswagon of Am., Inc. v. D'Amato*, 341 F.Supp.2d 734, 746 (E.D. Mich. 2004) (citation omitted). The Sixth Circuit "requires no particular finding of its likelihood to support injunctive relief." *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377 (6th Cir. 2006). That is, "[a] finding of irreparable injury ordinarily follows when a likelihood of

confusion of possible risk to reputation appears from infringement or unfair competition." *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999) (quoting *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 608)). This irreparable injury flows "both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values." *Wynn Oil*, 943 F.2d at 608 (citation omitted).

Here, the evidence of harm is more than presumptive. It is real and continuing. Each day that Discovery airs Undercover Billionaire and makes it available to the consuming public amounts to incalculable and irreparable harm to Plaintiff. First, Plaintiff has invested thousands of dollars in a national e-commerce platform. Tysoe Decl. ¶ 12. However, the actual confusion perpetuated by Discovery's broadcasts has now prevented Plaintiff from launching her e-commerce platform, damaging the future and growth of the business in an incalculable way. *Id.* ¶¶ 12-13.

In the meantime, Mosley/MLE is causing further irreparable harm by usurping all of the goodwill built by Plaintiff over the years, all while profiting from confused consumers and receiving an incalculable amount of free advertising and promotion from Discovery. For its part, Discovery continues to accrue countless revenue in streaming fees, season pass fees, and advertisements for distributing Undercover Billionaire and its infringing content.

Beyond accruing monetary harm, without a preliminary injunction, Plaintiff "will suffer irreparable harm due to [her] loss of control over the quality of service advertised and provided under [her] trademarks." *State Farm*, 2007 WL 4207158 at *11. *See also Lorillard*, 453 F.3d at 382 (finding irreparable harm in the plaintiff's "loss of control over the quality of goods that bear its marks"); *Frisch's v. Elby's Big Boy*, 670 F.2d. 642, 651 (6th Cir. 1982) (finding irreparable harm based on "substantial financial interest at stake," as plaintiff had "incurred great expense" in promoting its trademark). Plaintiff is being irreparably harmed without control of her reputation

18

and goodwill, just as with the plaintiff in *Lorillard*. Tysoe Decl. ¶¶ 7-14. To the extent Mosley and MLE close locations, report unsuccessful business ideas, or disclose failed investments and franchises, they control the reputation and goodwill of Plaintiff's ROOTED brand—not Plaintiff—harming Plaintiff's business and expansion opportunities. Tysoe Decl. ¶ 14.

### 3. *An injunction would not cause substantial harm to Defendants.*

The potential and ongoing injury to Plaintiff as a result of Defendants' actions substantially outweighs any damage that might be incurred by Defendants from a preliminary injunction against their display, advertisement, promotion and use of the ROOTED Marks. Plaintiff acknowledges that the removal of an entire season of a television program is not a small request for this Court. Yet, the damage to Plaintiff's expansion opportunities and established goodwill and reputation is irreparable and cannot be remotely resolved by any other means, especially where it is Plaintiff, not any Defendant, with the infringed intellectual property rights. Each episode of Season Two of Undercover Billionaire functions as a commercial for Mosley/MLE's brand to the detriment of Plaintiff. Again, Plaintiff should be no less protected against infringing activities than Tesla or Apple had their marks been infringed on a television show such as this.

Defendants, on the other hand, have no damage from an injunction other than the inability to continue infringing on Plaintiff's marks and further eroding the integrity of her brand. *See Choice Hotels Int'l, Inc. v. Apex Hosp., LLC*, No. 1-11-cv-00896, 2012 WL 2715716 at *3 (W.D. Mich. June 13, 2012) ("The third element, i.e., the balancing of hardships clearly tips in plaintiff's favor. The absence of a permanent injunction would leave plaintiff having its marks used in commerce by an entity over which it has no control. This clearly would impact the valuable goodwill associated with the ECONO LODGE family of marks. Defendants, on the other hand, are simply being ordered to obey the law by a permanent injunction."). Defendants cannot be

19

damaged by an injunction, since any "damage," i.e., lost revenue, would merely be the result of their illegal and unlawful infringements. *See Microsoft Corp. v. McGee*, 490 F.Supp.2d 874, 883 (S.D. Ohio 2007) (finding an injunction is warranted "because there is no harm to the Defendant inasmuch as an injunction will merely require Defendant to comply with the . . . Lanham Act").

### 4. *An injunction would be in the best interests of the public.*

"It is well settled that avoiding confusion in the marketplace by issuing an injunction is in the public interest." *State Farm*, 2007 WL 4207158 at *12 (references omitted). *See also Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, 756-57 (S.D. Ohio 2010) ("In trademark cases, public policy concerns may weigh in favor of preliminary injunctive relief because an injunction would halt confusion in the marketplace."); *Oskiera v. Chrysler Motors Corp.*, No. 90-2079, 1991 WL 164341, at *4 (6th Cir. Aug. 23, 1991) ("[D]ue to the likelihood of confusion the public interest would be served by issuing a preliminary injunction."); *Internet Specialties West, Inc. v. Milon-Digiorgio Enters.*, 559 F.3d 985, 993 (9th Cir. 2009). Here, it is in the public interest to enjoin all Defendants from any further use of ROOTED or public broadcast of their infringing content in light of the strong evidence of actual confusion that exists in the market. Consumers should not be misled or deceived, and these infringing uses operate to deceive not only Plaintiff's customers but also those of Defendants. Given that an injunction would resolve, or at least minimize, any actual and potential confusion between consumers searching for the true ROOTED products and services, the public interest weighs strongly in favor of granting preliminary injunctive relief.

## IV. CONCLUSION

For at least the reasons detailed above, Plaintiff respectfully requests that Defendants be preliminary enjoined from continuing their display, advertisement, promotion, and use of the ROOTED Marks and that this Court grant any other relief that it deems just and equitable.

Dated:  June 25, 2021                          Respectfully submitted,

                                               */s/ Philip R. Bautista*
                                               _____

                                               Philip R. Bautista (0073272)
                                               pbautista@taftlaw.com
                                               TAFT STETTINIUS & HOLLISTER LLP
                                               200 Public Square, Suite 3500
                                               Cleveland, OH 44114
                                               Phone : (216) 706-3957
                                               Fax : (216) 241-3707

                                               Aaron M. Herzig (0079371)
                                               aherzig@taftlaw.com
                                               TAFT STETTINIUS & HOLLISTER LLP
                                               425 Walnut Street, Suite 1800
                                               Cincinnati, OH 45202
                                               Phone : (513) 381-2838
                                               Fax : (513) 381-0205

                                               Jonathan G. Polak (*pro hac vice* forthcoming)
                                               jpolak@taftlaw.com
                                               TAFT STETTINIUS & HOLLISTER LLP
                                               One Indiana Square, Suite 3500
                                               Indianapolis, IN 46240
                                               Phone: (317) 713-3500

                                               Rachel A. Smoot (0092296)
                                               rsmoot@taftlaw.com
                                               TAFT STETTINIUS & HOLLISTER LLP
                                               65 E. State Street, Suite 1000
                                               Columbus, OH 43215
                                               Phone: (614) 221-2838
                                               Fax: (614) 221-2007

                                               *Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 25th, 2021, the foregoing Plaintiff's Memorandum in Support

of Its Motion for Preliminary Injunction was filed electronically using the Court's CM/ECF system

and served by electronic mail to:

Mark E. Avsec
mavsec@beneschlaw.com
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
200 Public Square, Suite 2300
Cleveland, OH 44114
Phone: (216) 363-4500
Fax: (216) 363-4588
*Attorney for Defendants Monique Idlett-Mosley*
*and Monique Lenai Enterprises, LLC*

Gregory F. Ahrens
gahrens@whe-law.com
WOOD HERRON & EVANS LLP
441 Vine Street
2700 Carew Tower
Cincinnati, OH 45202
Phone: (513) 241-2324
Fax: (513) 241-6234

Alison Schary
alisonschary@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, DC 20005
Phone: (202) 973-4248
Fax: (202) 973-4499

*Attorneys for Defendant Discovery, Inc.*

/s/ Philip R. Bautista
Attorney at law